**AGRILIANCE, L.L.C., Plaintiff,**

**v.**

**RUNNELLS GRAIN ELEVATOR, INC.,** BIG & Small, Inc. d/b/a Big & Small Trucking; T.R.I. Trucking; T.R.I. Harvesting; North River Farms, L.P.; Marie Anderson Farms; Margulies Trust; Scheltzbaum Farms; L & M Farms; Brody Farms; Mae Dillard Farms; Lehigh Osceola Farms, Defendants.

No. 4:02–CV–90390.

United States District Court,
S.D. Iowa,
Central Division.

July 21, 2003.

G. Mark Rice, Stephen D. Marso, Whitfield & Eddy, PLC, Des Moines, IA, for plaintiff.

Ken J. Smith, Selby Updegraff Smith & Holwerda, Newton, IA, for Runnells Grain Elevator, Inc., defendant.

Robert W. Reynoldson, Reynoldson Van Werden & Kimes, Osceola, IA, for Big & Small, Inc., defendant.

Eldon L. McAfee, Beving Swanson & Forrest PC, Des Moines, IA, for North River Farms, L.P., Margulies Trust, Brody Farms, defendants.

Eldon L. McAfee, Michael A. Wunn, Beving Swanson & Forrest PC, Des Moines, IA, for Marie Marie Anderson Farms, L&M Farms, defendants.

Thomas L. Flynn, Matthew T. Cronin, Belin Lamson McCormick Zumback & Flynn PC, Des Moines, IA, for Scheltzbaum Farms, defendant.

Philip F. Elgin, Kevin A. Parker, Kimberly G. Haddox, Indianola, IA, for Mae Dillard Farms, defendant.

Delbert C. Binford, West Des Moines, IA, for LeHigh Osceola Farms, defendant.

## MEMORANDUM OPINION AND ORDER

PRATT, District Judge.

Plaintiff Agriliance, L.L.C. ("Agriliance") filed this action on August 8, 2002 raising state law claims against Defendants for conversion of the proceeds of certain farm crops which were subject to a perfected security interest. Agriliance also alleges that its interest was enforceable against Defendant Runnells Grain Elevator, Inc. ("Runnells") in accordance with the Food Security Act of 1985, 7 U.S.C. § 1631(d) (the "Food Security Act"). Runnells has asserted various affirmative defenses against Agriliance and has cross-claimed against the other Defendants for contribution and indemnification. On February 3, 2003, this Court entered a default judgment against Defendant T.R.I. Trucking and T.R.I. Harvesting.

Now before the Court are two motions for summary judgment filed by Agriliance against Runnells and motions for summary judgment filed by Defendant Scheltzbaum Farms ("Scheltzbaum"); Mae Dillard Farms ("Mae Dillard"); Lehigh Osceola Farms ("Lehigh"); [1] and North River Farms, L.P., Marie Anderson Farms, Margulies Trust, L & M Farms, and Brody Farms (collectively, the "North River Defendants") against Agriliance, and against Runnells on its cross-claims. All Defendants that are party to these motions, other than Runnells, shall be referred to in the remainder of this opinion as the "Mitchell Creditors." Defendant Big & Small Trucking, Inc. is the only party not joining in any of these motions. A hearing on these motions was held on July 14, 2003. For the reasons set forth below, Plaintiff's first Motion for Summary Judgment, Plaintiff's Second Motion for Summary Judgment on Defendant Runnells' affirmative defenses, and the motions of Defendants Scheltzbaum, Mae Dillard, Lehigh, and the North River Defendants are hereby **granted**.

## I. Factual Background

For purposes of these motions, the Court takes the following facts, as set

---

**1.** Lehigh's counsel argued at hearing that Lehigh was not properly served and is not a proper party to this action because the entity "Lehigh Osceola Farms" does not exist, though noting that the lease that gave rise to the payments at issue in this action referenced two entities under joint ownership, Lehigh Clay Properties, Ltd., and Osceola Inc. Lehigh has failed to timely raise any issues of personal jurisdiction or service and has throughout these proceedings represented itself as Defendants Lehigh Clay Properties, Ltd. and Osceola, Inc., defending in the stead of Lehigh Osceola Farms. For purposes of these Motions, the Court will refer to Lehigh as the owner of the land referenced in the lease.

forth in the submissions of the parties to these motions, to be undisputed. Marvin and Marlene Mitchell (the "Mitchells") are farmers living in Dallas County, Iowa, with multi-state farming operations, including operations in Iowa. On March 5, 2001, the Mitchells executed a Promissory Note and Security Agreement to Agriliance, formerly Cenex/Land O'Lakes Agronomy Company ("Cenex"), in consideration for a loan of $950,231.00 to refinance a 2000 crop input loan from Agriliance and cover the Mitchells' 2001 crop expenses. As collateral, the Mitchells gave Agriliance a security interest in certain property of the Mitchells, including all crops grown on the land farmed by the Mitchells for the following four years and all proceeds from the crops, among other things. Agriliance perfected its security interest in the Mitchells' 2001 crops grown in Iowa by filing a Financing Statement with the Iowa Secretary of State on March 12, 2001.

In September, 2001, Agriliance sent a notice of its security interest to Defendant Runnells, a grain elevator and grain broker, which complied with the requirements of the Food Security Act and directed Runnells, when purchasing grain from the Mitchells that was subject to the security interest, to issue any payment for such grain jointly to Agriliance and the Mitchells (the "Notice"). A similar notice had been sent to Runnells in 2000 concerning the security interest of Agriliance (then, Cenex) in the 2000 crops and proceeds, and in April 2001, after the Mitchells repaid their loan for the 2000 crop, Agriliance had sent Runnells a letter releasing its lien on the 2000 crops and stating that joint checks were no longer required as to the 2000 crop.

Each of the Mitchell Creditors held a cash rent lease of certain agricultural land for the 2001 crop year with Marvin Mitchell or with entities he owned and controlled.[2] The leases gave the Mitchell Creditors a security interest in crops grown on the leased land, but did not grant the Mitchell Creditors any ownership interest in the crops. On June 28, 2001, Scheltzbaum filed a U.C.C. financing statement perfecting its landlord's lien pursuant to Chapters 554 and 570 of the Iowa Code. None of the other Mitchell Creditors filed a financing statement to perfect their respective landlord's liens. During the 2001 crop year, the Mitchells farmed the land subject to the leases with the Mitchell Creditors.

In November and December of 2001, the Mitchells sold crops grown on the leased land to Runnells, delivering them directly to third-party processors on Runnells' account. In conjunction with this sale, the Mitchells directed Runnells to draw on the Mitchells' account to issue checks directly to the Mitchell Creditors, which the Mitchell Creditors accepted as payment for rent obligations of the Mitchells (the "Checks"). The Checks did not name Agriliance as a payee, but instead were issued by Runnells and made payable solely to the respective Mitchell Creditor. They were also accompanied by stubs, some of which contained calculations based on bushels of corn that indicated how Runnells arrived at the amount indicated on the Check. The total amount of the Checks issued to the Mitchell Creditors is $153,855.15.[3]

---

**2.** Defendant Lehigh disputes that its land was properly referenced in the financing statement filed by Agriliance and argues that Agriliance therefore has no claim to the proceeds of any crops grown on its land. For reasons set forth below, the Court need not determine whether this alleged deficiency provides Lehigh alternative grounds for relief.

**3.** This sum does not include the checks issued to Defendants T.R.I. Trucking, T.R.I. Harvesting, which total $5,987.95. Agriliance has already received a default judgment against

The Promissory Note and Security Agreement held by Agriliance matured on February 10, 2002, and the Mitchells subsequently declared bankruptcy. Agriliance made demand on Runnells for payment of the amount of the Checks issued to the Mitchell Creditors in May and June, 2002. Runnells rejected Agriliance's demands and this lawsuit ensued. In this action, Agriliance seeks to recover from Runnells and the other Defendants the amount of the Checks issued by Runnells as proceeds of the Mitchells' 2001 crops.

Although Agriliance and the Mitchells dispute the amount currently owed to Agriliance under the terms of the Promissory Note and Security Agreement, the Mitchell loan is not at issue in this litigation. Also not at issue in this case are competing claims of Agriliance and West Central Co-op ("West Central") to the Mitchells' 2001 crops, which have been resolved in the Mitchell bankruptcy action in the United States Bankruptcy Court for the Southern District of Iowa. *See In re Marvin R. Mitchell and Marlene M. Mitchell,* No. 02–02720 (Bankr.S.D.Iowa 2003), Order of June 10, 2003 (Plaintiff's Supp.App., Ex. 26).

## II. Summary Judgment Standard

Summary judgment is properly granted when the record, viewed in the light most favorable to the nonmoving party and giving that party the benefit of all reasonable inferences, shows that there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Walsh v. United States,* 31 F.3d 696, 698 (8th Cir.1994); *United States v. City of Columbia,* 914 F.2d 151, 153 (8th Cir.1990). The moving party must establish its right to judgment with such clarity that there is no room for

controversy. *Jewson v. Mayo Clinic,* 691 F.2d 405, 408 (8th Cir.1982).

The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact based on the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Once the moving party has carried its burden, the nonmoving party must go beyond the pleadings and, by affidavits or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is genuine issue for trial. *See* Fed.R.Civ.P. 56(c),(e); *Celotex Corp.,* 477 U.S. at 322–23, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 257, 106 S.Ct. 2505.

On a motion for summary judgment, the Court is required to "view the evidence in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences." *United States v. City of Columbia,* 914 F.2d 151, 153 (8th Cir.1990). The Court does not weigh the evidence or make credibility determinations. *See Anderson,* 477 U.S. at 252, 106 S.Ct. 2505. Rather, the Court's sole task is to determine whether there are any disputed issues and, if so, whether those issues are both genuine and material. *Id.* "[T]he mere existence of some alleged factual dispute between the parties will not defeat a motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson,* 477 U.S. at 247–48, 106 S.Ct. 2505. An issue is "genuine," if the evidence is sufficient to persuade a reasonable jury to return a verdict for the nonmoving party. *Id.* at

these Defendants and the amount of damages recoverable here must therefore be exclusive

of the sum already recovered.

248, 106 S.Ct. 2505. A fact is "material" if the dispute over it might affect the outcome of the suit under the governing law. *Id.*

## III. Discussion

In this suit, Agriliance raises claims against Runnells and the Mitchell Creditors for conversion of the proceeds of the crops in which it claims a senior security interest, alleging that its security interest is enforceable against Defendants because the Notice to Runnells complied with the Food Security Act and the payments to the Mitchell Creditors were made in contravention of that interest. Runnells has cross-claimed against the Mitchell Creditors for contribution and indemnification. Agriliance has now moved for summary judgment against Runnells in reliance on the Notice, and the Mitchell Creditors have moved for summary judgment against Agriliance and against Runnells on its cross-claims. The crux of the motions is the relative priority of the various claims to the proceeds of the Mitchell crops. The Court will first address Agriliance's motion against Runnells and then consider jointly the motions brought by the Mitchell Creditors against Agriliance and Runnells.

### A. Agriliance's Claim for Conversion against Runnells

Under Iowa law, conversion is the "wrongful control or dominion over another's property contrary to that person's possessory right to the property." *Condon Auto Sales & Serv., Inc. v. Crick,* 604 N.W.2d 587, 593 (Iowa 1999). Thus, to prevail here, Agriliance must first demonstrate that it held a possessory right to the 2001 crops of the Mitchells, the proceeds of which were allegedly remitted by Runnells to the Mitchell Creditors. In its resistance, Runnells makes several unsubstantiated arguments that Agriliance is not the real party in interest in this dispute or the actual owner/holder of the Note, and

claims that the amount of any liability cannot be determined, since Agriliance's priority interest is disputed by Farm Pro Services, Inc., a lender with a competing interest in the 2001 crops. However, the resolution of the dispute between Agriliance and Farm Pro Services, Inc., which is not party to this action, is irrelevant on this motion, and Runnells' admissions, together with the affidavits presented by Agriliance, make clear that Agriliance is indeed the true party in interest and holds a perfected security interest in the Mitchells' 2001 crops. Agriliance's security interest gives it a possessory right to the Mitchells' 2001 crops, as against junior competing claims.

■ The primary issue, then, is whether Runnells in fact exercised wrongful control over the crops that were the subject of Agriliance's security interest. To sustain a claim for conversion, the "wrongful control must amount to a serious interference with the other person's right to control the property." *Id.* 593. Iowa courts consider the following factors in determining whether the conduct of the defendant amounted to a "serious interference" with the possessory rights of another: (a) extent and duration of the exercise of dominion and control; (b) actor's intent to assert a right inconsistent with the other's right; (c) the actor's good faith; (d) extent and duration of resulting interference; (e) harm to the chattel; and (f) inconvenience/expense to the other. *See Kendall/Hunt Publ'g Co. v. Rowe,* 424 N.W.2d 235, 247 (Iowa 1988).

■ The *Rowe* factors set forth above clearly support a finding of conversion here. The Food Security Act allows a buyer of farm products to take possession free of a perfected security interest, unless certain notices are provided to the buyer. Deposition testimony of Marvin Mitchell submitted on this motion shows that the crops sold to generate the monies that

Runnells paid to the Mitchell Creditors were 2001 crops. It is also undisputed that Agriliance held a perfected security interest in the Mitchells' 2001 crops and that Runnells received a notice meeting the requirements of the Food Security Act. Therefore, under the Food Security Act, Runnells took the crops subject to Agriliance's interest and by distributing the proceeds to the Mitchell Creditors, Runnells acted in contravention of Agriliance's interest. With regard to the extent and duration of control and the resulting interference, Runnells has exercised total control over the crops and their proceeds since November and December 2001, when the Checks were issued payable solely to the Mitchell creditors. Finally, the sale of the crops and distribution of the proceeds to the Mitchell Creditors is equivalent to the complete destruction of the collateral as far as Agriliance is concerned, and Agriliance has incurred considerable inconvenience and expense from the loss of the crop proceeds and the costs of asserting its claim in this litigation.

The only *Rowe* factors that requires a more thorough discussion are whether Runnells possessed the wrongful intent to convert the 2001 crops and proceeds and the related question of whether Runnells acted in good faith. Runnells first asserts here that it could not have possessed an intent to assert control over the 2001 crops to the prejudice of Agriliance because it believed the crops were owned by the Mitchell Creditors, not the Mitchells, and had no way of knowing that the crops sold were in fact 2001 crops, which would be subject to the Agriliance security interest.[4] Although the record here is disputed as to whether Marvin Mitchell affirmative-

ly told Runnells' employees that the crops at issue were the property of the Mitchell Creditors, it is clear that Runnells employees relied on Marvin Mitchell's directions as to who should receive payment from the crop. Taking his word as to the proper distribution of payment, Runnells did not actually know, it is argued, that the crops were not owned by the Mitchell Creditors, but instead belonged to the Mitchells themselves and were subject to Agriliance's security interest. Runnells also argues that because grain sold is often comingled, it would be impossible for Runnells (or anyone else) to determine whether the grain sold was from 2001 crops or not.

It appears that grain elevators, in the business of purchasing grain, rely primarily on the word of the seller or representative delivering the grain to distinguish and identify the crops they are purchasing. But even assuming that the business of grain brokerage is conducted on the same informal basis as Runnells' operations, the Court does not believe that Runnells' lack of actual knowledge that the crops were the ones subject to the Agriliance interest shields it from liability. Having received a Food Security Act notice, Runnells was obligated to maintain a mechanism that would properly protect the interests of the secured party. Here, Runnells knew that the Mitchells' 2001 crops were subject to Agriliance's security interest. Marvin Mitchell was also the party who delivered the crops and with whom they had directly negotiated the purchase. On these facts, Runnells should have known that the crops were quite possibly 2001 crops owned by the Mitchells and could therefore be subject to Agriliance's interest. However,

4. Runnells also argues it could not have intended to commit a conversion since it could not have known that the grain was from a cash rent, not a crop rent lease. The Court is uncertain how this distinction is relevant to Runnells' intent, but interprets Runnells' argument as synonymous with its general claim that it did not know the crops were not owned by the Mitchell Creditors to whom it remitted payment.

Runnells failed to make any inquiry to the Mitchells, the Mitchell Creditors, or Agriliance concerning the proper ownership of the crops or the possibility that the Agriliance indeed had an interest in the crops. Instead, Runnells relied solely on the word of Agriliance's debtor, Marvin Mitchell. Even if the Court were to credit Marvin Mitchells' claims that he was authorized by Agriliance to designate payments, there is no evidence in the record that Agriliance had authorized Runnells to deal with Marvin Mitchell as its agent. Absent any such authorization, Marvin Mitchell could not reasonably be presumed to speak for Agriliance. Thus, Runnells' failure to determine whether the crops delivered by the Mitchells were subject to Agriliance's interest evidences a reckless disregard for Agriliance's claim to the crops, which constitutes a wrongful intent to exercise control over the crops and their proceeds to the detriment of Agriliance.[5]

For these reasons, the Court finds that Runnells is liable to Agriliance for conversion. Absent any defense, Agriliance is entitled to recover from Runnells the proceeds of the Mitchell crops, which it remitted to the Mitchell Creditors.

## B. Runnells' Affirmative Defenses

In Counts III, IV, V, and VI of its First Amended Answer, Runnells raises affirmative defenses of estoppel, negligence, waiver, and failure to mitigate, which are the focus of Agriliance's Second Motion for Summary Judgment. With regard to the affirmative defenses, Agriliance must show "that there is an absence of evidence to support an essential element of the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). However, to adequately resist, Runnells must make a sufficient showing of each essential element of a claim with respect to which it has the burden of proof. *Id.* If it fails to do so, Agriliance is entitled to judgment as a matter of law.

### 1. Estoppel and Waiver

 Runnells' estoppel and waiver defenses here are based on the allegation that Agriliance "permitted Marvin Mitchell to direct the allocation of grain delivered to Runnells' account and designate the owner of the grain for payment of proceeds," and that Runnells "relied on the actions and inactions of Agriliance." (Answer at Counts III, V; Resistance to Plaintiff's First Motion at 9). Equitable estoppel is a valid defense to a conversion claim under the Food Security Act and is determined under state law. *See AG Servs. of Am., Inc. v. United Grain, Inc.*, 75 F.Supp.2d 1037, 1049 (D.Neb.1999). Under Iowa law, Runnells, as the party asserting the defense, must prove the following elements: 1) that Agriliance has misrepresented or concealed material facts; 2) that Runnells lacked knowledge of the true facts; 3) that Agriliance intended Runnells to act on the basis of the misrepresentation or concealment; and 4) Runnells relied upon the misrepresentation or concealment to its prejudice or injury. *See Folkers v. Britt*, 457 N.W.2d 578, 582 (Iowa 1990). As Runnells has not

---

**5.** The Court also notes that after receiving notice of Agriliance's security interest, Runnells' subsequent refusal to honor Agriliance's demand for recoupment of the crop proceeds, absent any defense, could also demonstrate intentional possession contrary to Agriliance's rights, though the Court need not reach this question here. *See* Rstmt. (Second) of Torts § 222A cmt. d (even one who "deals in good faith [and] acquire[s] an interest in the property ... may be liable for conversion after a demand and refusal by the defrauded vendor.... The mere receipt of the possession of the goods under such circumstances is conversion, [and a] subsequent refusal to surrender the chattel on demand may constitute a separate act of conversion").

presented to the Court facts demonstrating any misrepresentation or concealment which Agriliance committed, an absence of knowledge on the part of Runnells, or that Runnells relied to its detriment on any conduct of Agriliance, it cannot sustain a defense of equitable estoppel on the facts of this case.[6]

Under Iowa law, the party asserting waiver must show that "a right existed in the second party, that the second party knew of that right, and that the second party intended to give up that right." *Id.* at 581–82. The Eighth Circuit has recognized that "consent amounting to waiver of a security interest in collateral may be established by implication arising from a course of conduct as well as by express words." *Farmers' National Bank v. Missouri Livestock Commission Company,* 53 F.2d 991 (8th Cir.1931). A course of conduct is a sequence of prior dealing between the parties that establishes "a common basis of understanding" and generally supplements or qualifies their prior agreement. *See Dunn v. Gen. Equities of Iowa, Ltd.,* 319 N.W.2d 515, 516–17 (Iowa 1982). *See also* Iowa Code § 554.1205(1) (2001) (same).

In Count V of its First Amended Answer, Runnells has asserted that Agriliance knew of and acquiesced in a course of conduct that amounted to a waiver of the Notice requirements by allowing Marvin Mitchell to direct Runnells in issuing payment to the Mitchells'. creditors from grain proceeds. Agriliance contends that it did not authorize Mitchells to act differently from what was stated in the Notice nor was it aware that Runnells was issuing checks directly to the Mitchells' creditors

in 2000 or 2001. In cases involving sales of secured collateral, "[a] secured party must have actual knowledge of its debtor's sales of collateral without prior written consent before the secured party may be deemed to have waived its right to such consent by course of dealing." *C & H Farm Service Co. of Iowa v. Farmers Savings Bank,* 449 N.W.2d 866, 873 (Iowa 1989).

The parties present competing evidence as to whether Agriliance was aware of, or authorized, the Mitchells to direct payments from Runnells to its other creditors during the 2000 and 2001 crop years. Runnells relies exclusively on an affidavit of Marvin Mitchell that he was authorized by Agriliance's liaison, Randy Mitteness, to direct the crop payments, while Agriliance presents largely identical affidavits of Randy Mitteness and two other representatives that claim no personal knowledge of any such authorization. Runnells has presented no evidence of any communications from Agriliance to Runnells showing it had authorized Runnells to follow Marvin Mitchell's instructions rather than the Notice.

■ Even were the Court to conclude that these facts are sufficient to show a knowing waiver of the Notice requirements in 2000, it is undisputed that Runnells received a release of lien notice in early 2001 informing Runnells that it no longer needed to include Agriliance as a payee on payments from 2000 crops, and that it also received a new Notice from Agriliance of its security interest in the 2001 crops before the 2001 payments to the Mitchell Creditors were made. The

---

**6.** Although facts tending to substantiate waiver may also support a defense of equitable estoppel, nowhere in any of its responses on Plaintiff's motions has Runnells directed the Court to any authority whatsoever in support of its estoppel argument, or any of its other defenses, for that matter. This is a violation of the Local Rules requiring citations to authorities. L.R. 7.1(e). Where Runnells has failed to provide any indication of the legal principles behind its estoppel defense or a connection between the law and any pertinent facts, it is not this Court's responsibility to craft a defense on its behalf.

issuance of the 2001 Notice constitutes a withdrawal of any prior waiver that may have been given as to the 2000 crops. *See C & H Farm Serv.*, 449 N.W.2d at 871 (stating that a secured party's rights, even if previously waived, may be reasserted by subsequent notice of the secured party to the other party).

The 2001 notice must be viewed as a reinstatement of any previously waived rights, and Runnells has presented no evidence of transactions after the 2001 Notice and prior to the payment of the Checks that could show a course of conduct contrary to the Notice in 2001. Similarly, there is no evidence of any direct waiver by Agriliance to Runnells of its rights after sending the 2001 Notice, as Runnells admits that at no time did its employees discuss the security interest or a waiver of it with Agriliance. The only facts regarding waiver that follow the 2001 Notice are Marvin Mitchells' claims that he was "authorized" to direct Runnells, and Agriliance's denial that this was the case. As far as Runnells is concerned, any alleged communications between Agriliance and Marvin Mitchell should have been irrelevant once it received the 2001 Notice, unless Agriliance had itself communicated otherwise. Runnells has not put forth sufficient evidence that Agriliance intended to waive its security interest in the 2001 Mitchell crops.

For the foregoing reasons, Agriliance's motion is granted as to the estoppel and waiver defenses.

### 2. *Negligence*

In Count IV of the First Amended Answer and in its resistance, Runnells alleges that Agriliance knew the Mitchells were delivering grain directly to grain processors in Runnells' name and was negligent in failing to take actual possession of the Mitchell crops. Runnells also alleges that Agriliance was negligent by failing to correct or protest Mitchell's course of dealing with Runnells after learning of direct payments to the Mitchell Creditors in 2000, by delaying until five months after the sale of the grain before making any inquiry into the whereabouts of the crop proceeds, and by failing to ensure the complete subordination of a competing security interest of Farm Pro Services, Inc. Runnells' argument appears to be that it should not be held liable in this action because Agriliance's negligence contributed to the loss of its collateral interest in the Mitchell crops and proceeds.

Runnells' resistance on this point is limited to a recitation of its allegations without any evidentiary or legal support for this alleged defense. In any event, setting aside the question of whether Agriliance had a duty to take any of the actions urged by Runnells and the factual disputes surrounding these allegations, the Court must reject Runnells' argument under Iowa law. The Iowa Supreme Court has held that negligence, though included in the definition of fault under Iowa's comparative fault law, is not a defense to an intentional tort, such as conversion. *See* Iowa Code § 668.1(1); *Tratchel v. Essex Group, Inc.*, 452 N.W.2d 171, 180 (Iowa 1990). Moreover, Runnells, not Agriliance, had the responsibility to ensure that it complied with the requirements of the Notice and the Food Security Act. Secured lenders, such as Agriliance, are entitled to rely on the effectiveness of due notice under the Food Security Act and cannot be forced to take further steps to secure their interests that the Food Security Act does not require. Accordingly, Plaintiff's motion is granted as to this affirmative defense.

### 3. *Failure to Mitigate*

In Count VI of the First Amended Answer, Runnells alleges that it cannot be held liable to Agriliance for conversion

since Agriliance failed to mitigate its losses by refusing to accept payment offered to Agriliance by the Mitchells in January 2002 in satisfaction of the 2001 loan. While damage mitigation principles may apply to conversion actions to reduce the recovery owed to the injured party, the "defendant cannot undo his wrong by forcing the goods back upon their owner, either as a bar to the action, or in mitigation of damages." *Welke v. City of Davenport*, 309 N.W.2d 450, 453 (Iowa 1981) (citing W. Prosser, *The Law of Torts*, § 15, at 97 (4th ed.1971)). Here, the Mitchells offered Agriliance a check for $520,808.24 that was made jointly payable to Agriliance, West Central Cooperative, and the Mitchells, but only on condition that Agriliance fund the Mitchells' 2002 crop inputs, among other things. Runnells has presented no evidence refuting Agriliance's understanding of the offer. It alleges, in effect, that Agriliance's action is barred unless it had agreed to accept an offer from Mitchells that imposed additional obligations on Agriliance beyond those required under the terms of the original Note. These facts are neither a defense to Agriliance's conversion claim nor support for a reduction in the damages Agriliance seeks in this case. Agriliance's motion is granted as to this affirmative defense.

### C. Mitchell Creditors' Motions against Agriliance and Runnells

The four summary judgment motions of the Mitchell Creditors against Agriliance and against Runnells on its cross-claims raise largely identical issues and are therefore addressed jointly in the following discussion. The primary arguments of the Mitchell Creditors are that, under Chapter 554 of the Iowa Code (the "U.C.C."), they are "holders in due course" and are therefore entitled to the Checks free of Agriliance's prior security interest. In the alternative, they argue that they hold statutory landlord's liens which should be deemed superior to Agriliance's interest in the crop proceeds.

#### 1. Holder in Due Course

The central issue on the motions of the Mitchell Creditors is their holder-in-due course defense. Under the U.C.C., a holder in due course takes a negotiable instrument free of any claim to the instrument, including claims of prior secured parties. Iowa Code §§ 554.3302, 554.3306, 554.9331.[7] *See First Nat'l Bank v. Creston Livestock*, 447 N.W.2d 132, 133 (Iowa 1989). It is undisputed that the Checks accepted by the Mitchell Creditors are negotiable instruments subject to the priority rules of Article 3 of the U.C.C. *Valley Nat'l Bank v. Porter*, 705 F.2d 1027, 1029–30 (8th Cir.1983).

■ Because being a holder in due course is an affirmative defense to conversion, the Mitchell Creditors bear the burden of establishing each of the required elements. *See Waukon Auto Supply v. Farmers & Merchants Sav. Bank*, 440 N.W.2d 844, 850 (Iowa 1989). To sustain their burden, the Mitchell Creditors must each show that they took the instrument a) for value, b) in good faith, and c) without notice that it was overdue or had been dishonored, or of any contrary claim to rights in the instrument, and without notice that any party has a defense or claim in recoupment.[8] Iowa Code § 554.3302.

---

7. Iowa Code Section 554.9331(1) provides that the priority rules of Article 9 of Iowa Code Chapter 554 "[do] not limit the rights of a holder in due course of a negotiable instrument, [who] take[s] priority over an earlier security interest, even if perfected, to the extent provided in Articles 3, 7, and 8." Article 3

of the U.C.C. further provides that a holder in due course takes free of any claim to a negotiable instrument. Iowa Code § 554.3306.

8. It must also be proven that the instrument, when issued, bore no apparent evidence of forgery, that it was not otherwise irregular or

The parties do not dispute that the Mitchell Creditors accepted the Checks for value, in repayment of outstanding obligations of the Mitchells. The key issues on this motion are whether the Mitchell Creditors have satisfied the good faith and notice requirements of the holder-in-due course defense. The Courts' analysis of good faith and notice is largely identical in this case, because the sole dispute as to each concerns the effect of Agriliance's filing a financing statement evidencing its interest in the Mitchells' 2001 crops—specifically, whether the Mitchell Creditors were obligated to conduct a U.C.C. lien search and whether the existence of Agriliance's lien in the public record put the Mitchell Creditor's on constructive notice of Agriliance's claim.

a. *Good Faith*

Under Article 3, good faith is defined as "honesty in fact and the observance of reasonable commercial standards of fair dealing." Iowa Code § 554.3103(1)(d). *See also* Iowa Code § 544.1201(19) (general definition of "good faith" is "subject to additional definitions contained in subsequent Articles of this Chapter"). The Article 3 definition of good faith thus contains both an objective and a subjective element.[9] The subjective prong has been satisfied here, as the parties do not dispute that the Mitchell Creditors had no actual knowledge of Agriliance's security interest and did not otherwise act in bad faith.

Even so, Agriliance and Russells argue that reasonable commercial standards of fair dealing required the Mitchell Creditors to conduct a search of the public records, which would have revealed the existence of Agriliance's prior claim, and that therefore the objective element of good faith cannot be satisfied here. In support, they point to language in Comment 5 to the U.C.C. that "there may be some circumstances in which 'reasonable commercial standards of fair dealing' would require such a search." U.C.C. § 3–103, cmt. 5. However, as the Mitchell Creditors note, the text quoted from Comment 5 above begins with the general statement that " 'good faith' does not impose a general duty of inquiry, e.g., a search of the records in filing offices"—the standards of fair dealing relied on by Runnells only provide a limited exception to that rule. *Id.* Furthermore, the language of the Iowa Code shows that neither a showing of good faith nor the availability of the holder in due course defense itself is defeated by the mere existence of a perfected security interest. *See* Iowa Code § 554.9331(3) ("[f]iling under this Article does not constitute notice of a claim or defense to [holders in due course of negotiable instruments].").

Moreover, the "fair dealing" exception, which may give rise to a duty of inquiry, is not concerned with standards of care. *See, e.g. State Bank of the Lakes v. Kansas Bankers Surety Co.*, 328 F.3d 906, 909 (7th Cir.2003) (defining the "fair dealing" prong of the Article 3 "good faith" test as "avoidance of advantage-taking, which ... differs from due care"). This is supported by the text of the U.C.C., which clearly distinguishes "ordinary care" from fairness. *See, e.g.* U.C.C. § 9–103(7) (defining separately "ordinary care"); Iowa Code

---

incomplete so as to call into question its authenticity, and that the party asserting the defense took the instrument without notice that the instrument contains an unauthorized signature or had been altered. However, there is no dispute here as to these requirements.

9. The objective component of good faith under Article 3 was added by amendment in 1995. *See* Iowa Code § 554.3103(a)(4); U.C.C. cmt. 4. Articles 3 and 4 had formerly incorporated the definition of Section 1–201(19) of the U.C.C., which is a purely subjective definition.

§ 554.3103(g) (same, for purposes of Article 3). In addition, the comment to Iowa Code § 554.3103(d) states that "fair dealing ... is concerned with the fairness of conduct rather than the care with which an act is performed. Failure to exercise ordinary care in conducting a transaction is an entirely different concept than failure to deal fairly in conducting the transaction." Iowa Code § 554.3103(d), cmt. 4. Clearly, objective commercial standards of fairness cannot be conflated with a general duty of care.

However, the Court must still consider whether reasonable commercial standards of fair dealing would require the Mitchell Creditors to conduct a lien search, as urged by Agriliance and Runnells. Agriliance and Runnells argue that objective fairness imposed such a duty on the Mitchell Creditors because 1) the Checks were issued by a grain elevator, 2) they were accompanied by check stubs that contained calculations based on corn delivered by the Mitchells, 3) the landlord Mitchell Creditors had cash-rent rather than a crop-rent leases and had no ownership interest in the crops grown, and 4) the Mitchell Creditors knew that farmers regularly pledge crops as collateral.

The examples cited in Comment 5 to UCC § 9–311 do not give guidance on the commercial standards applicable here. None of the Mitchell Creditors are in the business of financing or buying accounts receivable, a typical form of collateral. *Cf.* UCC § 9–311, Comment 5 (citing *Utility Contractors Financial Services, Inc. v. Amsouth Bank, NA*, 985 F.2d 1554 (11th Cir.1993)). Even assuming for the purposes of this argument that crops are regularly pledged as collateral, the Court does not believe this alone brings all farm landlords within the exception that may apply to dealers in receivables. *See Valley Nat'l Bank v. Porter*, 705 F.2d 1027, 1029 (8th Cir.1983). As the Mitchells' crops were subject to multiple liens, including those of Agriliance, the Mitchell Creditors, and possibly Farm Pro Service, Inc., this case is also distinguishable from one in which the debtor had agreed not to grant a junior lien in their crops and the creditor could be held to constructive notice of a filing to that effect. *Id.* More critically, the Court is unwilling to rely as heavily on the Comments to the U.C.C. when the question of fairness is necessarily an inquiry into the particular commercial standards and facts relevant to the instant case.

The Court is not aware of any precedent addressing what "reasonable commercial standards of fairness" may apply to lessors of farm real estate, and while Agriliance and Runnells assert that the Court may take judicial notice of commercially reasonable standards, they do not state the standard that should be so noticed. *See, e.g.* Runnells' Resistance at 4, *citing Waukon*, 440 N.W.2d at 850. Nor have any of the other parties provided any guidance to the Court on this matter. Nearly without exception, the cases addressing reasonable commercial standards under Article 3, including those relied on by Agriliance and Runnells, concern banks and cannot be appropriately extended to farm landlords like the Mitchell Creditors. *See, e.g. Waukon*, 440 N.W.2d at 847–50; *Phariss v. Eddy*, 478 N.W.2d 848, 852 (Iowa Ct.App. 1991) (applying Iowa Code § 554.3419(3) (1991)). Moreover, the *Waukon* and *Phariss* cases concern reasonable commercial standards for accepting endorsed instruments, rather than the good faith standards of *fair dealing*.

As the parties appear to recognize, the ultimate question of whether the Mitchell Creditors violated objective standards of fairness in accepting the Checks is at base whether a reasonable landlord in their circumstances would have had reason to

know of a potential competing claim to the crop proceeds, such that a lien search should have been conducted before the Checks were accepted. Thus, the analysis here merges with the question of notice, which the Court addresses more fully below. Unless the Mitchell Creditors had constructive notice of Agriliance's claim, the mere fact that they are farm landlords cannot overturn the rule that "good faith" imposes no general duty of inquiry.

### b. Notice

Notice of a fact exists where a person "has actual knowledge of it, ... has received a notice or notification of it, or from all the facts and circumstances known to the person at the time in question, the person has reason to know that it exists." Iowa Code § 554.1201(25). Once again, the mere existence of a public filing is not sufficient to charge a party with notice of that claim. Iowa Code § 554.9331(3). Under Iowa law, a court must determine whether the holder's actual knowledge is, under the circumstances, sufficient to allow the holder to "reasonably infer the probable existence of the claim." *Porter*, 705 F.2d at 1029. That the Mitchell Creditors did not know of Agriliance's claim is undisputed on these motions. However, Agriliance and Runnells argue that the Mitchell Creditors cannot satisfy the objective notice standard because a reasonable farm landlord in the shoes of the Mitchell Creditors would have known of potential prior claims to the Checks and should therefore have conducted a search of filings records that would have apprised them of the existence of Agriliance's prior claim to the crop proceeds.

Here, the circumstances that allegedly should have alerted the Mitchell Creditors to the possibility of a secured creditor are that the Mitchell Creditors had cash rent, rather than crop rent leases, and held no ownership interest in the crops, but accepted Checks issued by a grain elevator

and accompanied by stubs showing the amount calculated based on bushels of corn. In determining whether these facts defeat the Mitchell Creditors' claim under Iowa law, the Court finds instructive the Eighth Circuit's decision in *Valley National Bank v. Porter*, 705 F.2d 1027. Although Agriliance and Runnells reject *Porter* and other authorities cited by the Mitchell Creditors as predating the objective "good faith" test of Article 3, these cases still provide guidance with respect to the objective requirement for notice, which was unaffected by the 1995 amendments to the "good faith" test. Where, as here, the objective good faith and notice tests are the same, the analysis of these earlier cases also has bearing on the objective prong of the good faith analysis.

In *Porter*, the Internal Revenue Service ("IRS") had received checks from known account debtors, which were endorsed by the taxpayer and forwarded directly to the IRS in satisfaction of outstanding taxes due. *See* 705 F.2d 1027. Although the Circuit's opinion does not detail the other "suspicious circumstances" that the district court found could not have afforded notice, the fact that the checks clearly represented accounts receivable, a common form of security, did not preclude an affirmance of the district court's finding that the IRS did not have constructive notice that the checks represented secured proceeds. *See* 705 F.2d 1027. In so holding, the Eighth Circuit did not impose upon the IRS a duty to search the public record. *See id.* Applying *Porter* to the facts of this case, the Court concludes that knowledge that a check represents proceeds of farm crops, even assuming that farm products are typically used as collateral, does not itself constitute constructive notice to the holder of the check.

The only other fact which allegedly should have apprised the Mitchell Credi-

tors of competing claims to the Checks is that they were accompanied by stubs showing the amount calculated based on bushels of corn, while the Mitchell Creditors held cash rent, not crop rent leases and held no ownership interest in crops grown on the leased land. At oral argument, counsel for Runnells maintained that stubs showing bushels of corn grown would be issued to the owner of the grain and that the Mitchell Creditors held no ownership interest. However, the Court has received no evidence that the mere designation of the source of cash rent, here bushels of corn, would indicate a possible prior security interest, other than by showing the Checks represented crop proceeds, which under *Porter* does not amount to constructive notice.

It is undisputed that the Mitchells did hold an ownership interest in the crops grown on the land, and although the Mitchell Creditors did not, the land was leased for farming purposes and secured by a lien on the crops. The Court does not believe a reasonable jury could find that receipt of a tenant's rent payments in a form that showed them to be proceeds of crops would arouse suspicion in a reasonable landlord that something was amiss or that a potential secured party was waiting in the wings.

■ Because the evidence presented does not demonstrate that the Mitchell Creditors had knowledge that would have aroused reasonable suspicion of a potential secured creditor's interest, the Mitchell Creditors cannot be charged with constructive notice of Agriliance's claim by virtue of the financing statement, which an investigation of the public record would have revealed. Similarly, the Court does not believe that objective standard of commercial fair dealing imposed the facts set forth here bring the Mitchell Creditors within the exception to the general rule that a search of filing records is not re-

quired. Because the Mitchell Creditors took the Checks in good faith and without notice of Agriliance's claim, they are holders in due course and took free and clear of Agriliance's perfected security interest.

### 2. *Priority of Landlord's Liens*

Certain of the Mitchell Creditors also argue on these motions that they hold statutory landlord's liens under Iowa Code § 570.1(1) that are senior to the security interest of Agriliance and that they therefore hold rightful claim to the Checks, even if the Court finds they are not entitled to the crop proceeds as holders in due course. Iowa Code § 570.1(1) (2002). Section 570.1(1) grants a landlord a statutory "lien for the rent upon all crops grown upon the leased premises," which Iowa courts have extended to apply to the proceeds of such crops as well. *See Meyer v. Hawkeye Bank & Trust Co.*, 423 N.W.2d 186, 189 (Iowa 1988); *Perkins v. Farmers Trust & Sav. Bank*, 421 N.W.2d 533, 535 (Iowa 1988). Section 570.1(2), added by the 2001 amendments to the Iowa Code, requires a landlord to file a financing statement under § 554.9308 to perfect its statutory lien in farm products. Iowa Code § 570.1(2). A perfected landlord's lien in farm products has priority over a prior perfected security interest. *Id.*

■ Scheltzbaum perfected its landlords' lien in the crops grown on its land and their proceeds by filing a financing statement with the Iowa Secretary of State, as required by the 2001 amendments to Chapter 570 of the Iowa Code. Therefore, Scheltzbaum's perfected landlord's lien grants it a priority interest in the Mitchell crop proceeds over the competing security interest of Agriliance, even if it were not a holder in due course.

The other Mitchell Creditors also entered into leases with the Mitchells prior to the 2001 amendments, but concede that

they failed to perfect their statutory liens under Iowa Code § 570.1(2), as Scheltzbaum did. They also agree that Agriliance's security interest extended to the proceeds generated by the sale of farm products. *See* Iowa Code § 554.9315(1)(b) (2002). However, they maintain that there is a critical distinction between liens on farm products, to which the perfection requirement applies, and liens on the proceeds of farm products, to which, it is argued, the perfection requirement does not apply. Thus, they argue that their unperfected liens are superior to the security interest of Agriliance with respect to the Checks. The Court appreciates the thorough arguments of counsel in briefing and in oral argument on the proper interpretation of the 2001 amendments and the policy rationales favoring one interpretation over the other. Because the Court has found that the Mitchell Creditors are holders in due course, it need not reach this alternative argument. The Court also believes this to be the more prudent course where the issue is both strongly contested by the parties and raises questions of statutory interpretation that are better left to the state courts.

### 3. *Cross–Claims for Indemnification, Contribution, and Unjust Enrichment*

Runnells has cross-claimed against the Mitchell Creditors in this action for contribution, indemnification, and unjust enrichment. The common law principles underlying these "three interrelated theories" are employed to prevent unjust enrichment and grant one party, who has satisfied a claim, the right to seek reimbursement from another party. *See State ex rel. Palmer v. Unisys Corp.*, 637 N.W.2d 142, 149 (Iowa 2001). In order to recover on any of these grounds, a party can only recover sums paid in satisfaction of a third party's claim from another party if that other party would have been directly liable to the third party, but for the payment. *Id.* at 150. Because the Court has found that the Mitchell Creditors have no direct liability to Agriliance, Runnells' cross-claims for contribution, indemnification, and unjust enrichment fail as a matter of law.

### III. Order

Plaintiff's Motion for Summary Judgment and Plaintiff's Second Motion for Summary Judgment on Defendant Runnells' affirmative defenses are **granted**. The Motions for Summary Judgment of Defendants Scheltzbaum, Mae Dillard, and Lehigh, and the joint Motion for Summary Judgment of the North River Defendants, each against Agriliance on its claim and Runnells on its cross-claims, are hereby **granted**.

As Agriliance has already recovered $5,987.95 of the $159,843.10 it seeks in damages by a default judgment issued against Defendants T.R.I. Trucking and T.R.I. Harvesting, judgment is hereby entered in favor of Agriliance and against Defendant Runnells in the amount of $153,855.15. It is further ordered that costs will be calculated by the Clerk of Court and assessed against Defendant Runnells Grain Elevator, Inc.

Finally, the Court notes that trial in this case is scheduled to begin on August 11, 2003, and that the disposition of these motions resolves all claims raised in this action other than those against Defendant Big & Small, Inc. Therefore, Agriliance, Runnells, and Defendant Big & Small, Inc. are hereby ordered to advise the Court as to the status of the claims against Big & Small, Inc. by the close of business on July 28, 2003.

IT IS SO ORDERED