In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 02-2534 & 02-2665

STATE BANK OF THE LAKES,

*Plaintiff-Appellee, Cross-Appellant*,

*v.*

KANSAS BANKERS SURETY CO.,

*Defendant-Appellant, Cross-Appellee.*

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 98 C 3212—**Elaine E. Bucklo**, *Judge.*

ARGUED APRIL 18, 2003—DECIDED MAY 12, 2003

Before EASTERBROOK, KANNE, and DIANE P. WOOD, *Circuit Judges.*

EASTERBROOK, *Circuit Judge.* For more than a decade, State Bank of the Lakes loaned money to Pistakee Marina, Inc., to finance its inventory. The Bank took custody of each Manufacturer's Statement of Origin (MSO), a document that Pistakee needed before it could deliver good title to a customer. Release of the MSO was linked to repayment of the advance. The Bank also checked Pistakee's premises to see whether the boats identified by the certificates were there; they always were, and Pistakee always repaid

the loans—until 1997. That year Pistakee went under, and the Bank discovered that it had been duped by William Slater, Pistakee's owner. Slater trumped up MSOs in order to obtain loans from multiple sources against the same collateral. One lender would get the real MSO (and thus the security interest); others would receive fakes. Slater diverted the extra proceeds to personal use. For this scheme Slater was convicted of bank fraud and served 46 months' imprisonment. See *United States v. Slater*, No. 00-2767 (7th Cir. Jan. 18, 2001) (unpublished order). The Bank turned to Kansas Bankers Surety Co. seeking indemnity on account of those loans against boats for which some other lender held the real MSO and thus obtained the value of the collateral.

Kansas Bankers Surety issued a "Crime Bond" insuring the Bank against losses caused by borrowers' crimes. The critical language promises to indemnify the Bank for:

> Loss resulting directly from the Insured having, in good faith, for his own account or for the account of others,
>
> > (1) acquired, sold or delivered, or given value, extended credit or assumed liability, on the faith of, any original
> >
> > > (a) Certificated Security,
> > >
> > > (b) Document of Title,
> > >
> > > (c) deed, mortgage or other instrument conveying title to, or creating or discharging a lien upon, real property,
> > >
> > > (d) Certificate of Origin or Title,
> > >
> > > * * *
> > >
> > > > which
> > > >
> > > > > (i) bears a signature of any maker, drawer, issuer, endorser, assignor,

lessee, transfer agent, registrar, acceptor, surety, guarantor, or of any person signing in any other capacity which is a Forgery, or

(ii) is altered;

* * *

(3) acquired, sold or delivered, or given value, extended credit or assumed liability, on the faith of any item listed in (a) through (d) above which is a Counterfeit.

A MSO is a "Certificate of Origin or Title" within the scope of subsection (1)(d). Coverage depends on the Bank having physical possession of the bogus document (a condition concededly met). Yet another clause defines "counterfeit" as "an imitation which is intended to deceive and to be taken as an original"; the bond does not define the phrase "good faith."

Slater took great care to make his impostures look like the real McCoys. He used the same kind, size, texture and color of paper as the originals; he employed identical inks and typefaces and duplicated manufacturers' logos. It was easy to supply the correct information about the model and serial numbers of the boats, which Pistakee had in its possession. And Slater forged signatures that passed for those of the manufacturers' authorized representatives. Sometimes Slater presented unsigned MSOs, and the Bank advanced funds against both signed and unsigned certificates. Kansas Bankers Surety, however, distinguished the two. It conceded that signed certificates are "counterfeit" under the bond's terms and that a lender acting with due care would have been taken in by them. But the unsigned bogus MSOs were not "counterfeit," it contended, adding that lending against unsigned documents also did not evince "good faith." This suit under the diversity jurisdiction followed. Judge Marovich denied the under-

writer's motion for summary judgment, ruling that material disputes require a trial. 1999 U.S. Dist. LEXIS 13269 (N.D. Ill. Aug. 19, 1999). Judge Bucklo then conducted a bench trial, concluded (as we have already mentioned) that Slater's fakes looked like the real things, and held that the Bank is entitled to about $290,000 to cover its losses on advances to Pistakee against unsigned imitation MSOs. Judge Bucklo concluded, however, that the insurer's position had been neither unreasonable nor vexatious and denied the Bank's request for penalties and attorneys' fees under 215 ILCS 5/155. Both sides have appealed. They agree that Illinois law applies.

Kansas Bankers Surety's first contention is that unsigned documents cannot be "counterfeit." Yet nothing in that word's definition—"an imitation which is intended to deceive and to be taken as an original"—requires a signature. A $50 bill, printed in green ink on rag paper with an imitation Treasury watermark and a fine etching of Ulysses S. Grant, looking for all the world like a real Federal Reserve Note but lacking a facsimile of the Treasurer's signature in the lower left hand corner, would be a "counterfeit" for purposes of federal laws against counterfeiting. See 18 U.S.C. §472; *United States v. Gomes*, 969 F.2d 1290 (1st Cir. 1992). Such a document would deceive even wary recipients. Under the bond's definition it is enough if an "imitation" is "intended to deceive". Slater's fraudulent intent is conceded, and the district judge, as trier of fact, was entitled to conclude that these fakes were close enough to be "imitations".

For all we know, *genuine* MSOs are accepted in the trade even though unsigned. Neither side adduced any evidence about the likelihood that genuine MSOs bear signatures, or banks' willingness to extend credit against unsigned MSOs. It is possible that Slater left some of the fakes unsigned because otherwise they would be too perfect. A skilled swindler creates documents with the same

degree of variability as the originals—for example, some signed clearly, others in an illegible scrawl, and some not at all. Perhaps Slater followed the originals to the last detail, omitting signatures when the originals had none. (The record unfortunately does not permit a test of this hypothesis.) A trier of fact was entitled to conclude that a phony that looks like an original is an "imitation" whether or not signed, and thus is a counterfeit. The bond itself implies this possibility. Section (1) deals with documents that have either forged (subsection (i)) or altered (subsection (ii)) signatures. Section (3), covering counterfeits, does not mention signatures. This confirms the district court's understanding (and ours) that an unsigned document may be "an imitation which is intended to deceive and to be taken as an original" and thus be a "counterfeit."

Kansas Bankers Surety's other contention is that the Bank did not act in "good faith," as the bond's introductory language requires. The bond does not define the phrase "good faith", nor does the Illinois Insurance Code offer an off-the-rack definition; in this litigation the insurer equates it with "due care." Yet "good faith" usually establishes a subjective standard, while due care is objective. Why write "in good faith" if you mean "in the exercise of reasonable care"? Many negligent acts are committed with pure hearts and empty heads. More than that: it is hard to see how equating "good faith" with "due care" could help Kansas Bankers Surety, for then it would add little if anything to the definition of "counterfeit." An "imitation" is something that will bilk a person using ordinary care—which is to say, an unsuspecting person who is not negligent. See *United States v. Turner*, 586 F.2d 395, 397-98 (5th Cir. 1978) (another decision about the meaning of "counterfeit" in the criminal law). Something that will deceive only a child or a bonobo is not an "imitation" under the bond; it has to be good enough to fool a banker. By concluding that the documents were "imita-

tions," the district court implicitly found that the Bank *had* used due care in accepting them. And a decision at trial that one or another course of conduct evinced due care may be upset on appeal only if unreasonable. We will not disturb the district court's resolution; as we have observed, the insurer did not proffer any evidence suggesting that bankers regularly reject *genuine* but unsigned certificates, so there is no evidentiary foundation for a conclusion that these fakes would not have got by loan officers who used ordinary prudence.

Insurers worry about moral hazard—that a bank, knowing that someone else will pick up the tab, becomes slovenly. This is not a major worry when coverage is limited to criminal frauds, however; banks must protect themselves against many other hazards of secured lending. Banks also must ensure that the chattel paper refers to real collateral; several decisions have held that fake documentation pertaining to nonexistent chattels is not "counterfeit." See *Capitol Bank of Chicago v. Fidelity & Casualty Co. of New York*, 414 F.2d 986, 988-89 (7th Cir. 1969); *Bank of the Southwest v. National Surety Co.*, 477 F.2d 73, 77 (5th Cir. 1973); *Exchange National Bank of Olean v. Insurance Co. of North America*, 341 F.2d 673, 676-77 (2d Cir. 1965). That's why the Bank checked to ensure that Pistakee had in inventory the boats specified by the certificates. Moreover, Kansas Bankers Surety reviewed its clients' loss experience annually and adjusted the premiums. Over the long run, State Bank of the Lakes pays a price that reflects, not the average loss in the business, but its own loss rate, which gave the Bank a strong incentive to take care. If the insurer wanted additional protection against moral hazard, it had to put that in the contract. "Good faith" is just too far removed from the question whether a lender took cost-justified precautions. Insurers must write clearly; ambiguities are resolved in policyholders' favor. See, e.g., *May Department Stores Co. v. Federal Insurance Co.*, 305 F.3d 597, 600

(7th Cir. 2002). But this doctrine does not come into play here; "good faith" is in a different phylum from "due care," so there is no linguistic tie to break. (Even Article 3 of the UCC, which contains a definition of "good faith" resembling what Kansas Bankers Surety proposes—"honesty in fact and the observance of reasonable commercial standards of fair dealing", 810 ILCS 5/3-103(a)(4)—links commercial reasonableness to "fair dealing." Avoidance of advantage-taking, which this section is getting at, differs from due care.)

As for the Bank's contention that Kansas Bankers Surety behaved unreasonably and vexatiously by declining to pay unless ordered to do so by a judge: here, too, the decision reached by the trier of fact must be respected unless clearly erroneous—which this decision is not. The insurer paid promptly with respect to the signed fakes, reserving for judicial decision only legal questions that (as the absence from this opinion of citations to decisions interpreting similar policy language reveals) have not been the subject of appellate decisions. It is never unreasonable to seek resolution of novel interpretive points. Kansas Bankers Surety did not lie or stall in the process; it simply disagreed with the Bank about the meaning of the bond. Such disagreements are normal in business, and taking a legal position that promotes one's self-interest is entirely lawful.

AFFIRMED

A true Copy:

      Teste:

                          _____
                          *Clerk of the United States Court of Appeals for the Seventh Circuit*