AGRILIANCE, L.L.C., a Delaware
L.L.C., Plaintiff,

v.

FARMPRO SERVICES, INC., and
Central Bank, Defendants,

Farmpro Services, Inc., Third–
Party Plaintiff,

v.

Maurice Mitchell, Sr., and Phyllis
Mitchell, Third–Party
Defendants.

No. 4:02–CV–40240.

United States District Court,
S.D. Iowa, Central Division.

Aug. 15, 2003.

G Mark Rice, Whitfield & Eddy PLC, Des Moines, IA, Stephen D Marso, Whitfield & Eddy PLC, West Des Moines, IA, for Agriliance LLC.

Peter C Riley, Tom Riley Law Firm, Cedar Rapids, IA, for Third Rock, Inc.

Charles L Smith, Telpner Peterson Smith & Ruesch, Council Bluffs, IA, for Charles L. Smith.

Thomas L Flynn, Matthew T Cronin, Belin Lamson McCormick Zumback & Flynn PC, Des Moines, IA, for Farmpro Services, Inc.

Matthew T Cronin, Belin Lamson Mccormick Zumback & Flynn PC, Des Moines, IA, for Central Bank.

## ORDER ON PLAINTIFF AGRILIANCE, L.L.C.'S and DEFENDANTS FARMPRO SERVICES, INC. and CENTRAL BANK'S CROSS–MOTIONS FOR SUMMARY JUDGMENT

GRITZNER, District Judge.

Plaintiff, Agriliance, L.L.C. ["Agriliance"], a Delaware limited liability corporation with its principal place of business in Minnesota, filed this action on May 24, 2002, against Farmpro Services, Inc. ["Farmpro"], an Iowa citizen, raising state law claims for conversion and breach of contract. On December 27, 2002, Agriliance amended its complaint to assert the conversion claim against Central Bank, also an Iowa citizen.

Defendants have asserted three affirmative defenses: (1) failure of Agriliance to mitigate damages; (2) negligence on the part of Agriliance; and (3) Defendants' status as a holder in due course. Currently pending before the Court are cross-motions for summary judgment on all counts filed by Plaintiff and Defendants. For the reasons discussed, Plaintiff's Motion for Summary Judgment (Clerk's No. 32) is denied in part and granted in part, while Defendants' Motion for Summary Judgment (Clerk's No. 37) is denied in full.

### I. FACTS

Marvin and Marlene Mitchell ["the Mitchells"] farmed in central Iowa and in parts of Louisiana. The dispute in this case centers around Agriliance having provided the Mitchells a loan for their 2001 crop input expenses. As part of this loan, the Mitchells made, executed, and delivered to Agriliance a written Promissory Note and Security Agreement ["Note"] on March 5, 2001. The original principal amount of the loan was $950,231.00, and the Note granted to Agriliance a security interest in, among other things, all crops growing or to be grown in 2001, all harvested crops, and cash and noncash proceeds from the sale of any collateral described in the Note.

By the time Agriliance agreed to fund the Mitchells' 2001 crop input expenses, they had already experienced trouble meeting loan obligations for their crop input expenses for previous years. For example, in 1998 and 1999, Farmpro loaned the Mitchells money for crop input ex-

penses; at the time they were made, the Mitchell loans were around 25 percent of the total Farmpro business and were two of the largest loans ever made by Farmpro. By December 1999, the Mitchells had not met their obligations under these loans and owed Farmpro a substantial sum of money on both loans.

Marvin Mitchell's father, Third–Party Defendant Maurice Mitchell, Sr. ["Mitchell Sr."], eventually became involved in the Mitchells' obligations concerning these 1998 and 1999 Farmpro loans. In January 2000, the Mitchells, Mitchell Sr., and Farmpro entered into a Debt Settlement Agreement ["Settlement Agreement"], wherein the Mitchells' 1998 loan was restructured, the timeline for the Mitchells to pay off the 1999 loan was extended, Mitchell Sr. made guarantees as to the Mitchells' debts, and Farmpro received mortgages on certain real estate to secure the loans.

Aware of Farmpro's history with the Mitchells, before providing an input loan for the Mitchells' 2001 crops, Agriliance required Farmpro to subordinate its interests in the Mitchells' 2001 crops and proceeds thereof. On March 8, 2001, Farmpro's CEO, David Drey ["Drey"], executed a Security Interest of Statutory Lien Subordination Agreement ["Subordination Agreement"], wherein Farmpro did subordinate its interest in, among other things, the Mitchells' 2001 crops to Agriliance, as well as all cash and noncash proceeds from the sale, exchange, collection, or disposition of any of the collateral. On March 12, 2001, Agriliance properly filed a financing statement describing its security interest in the collateral described in the Note and

addendum to the Note. Agriliance then provided a loan to the Mitchells for their 2001 crop input expenses.

At some time during the fall of 2001, the Mitchells harvested the 2001 crop subject to Agriliance's perfected security interest and Subordination Agreement. In January 2002, after the Mitchells contacted Agriliance seeking crop input financing for the 2002 growing year, Agriliance came to believe the Mitchells sold their crops to Mitchell Sr. and were in possession of and refusing to remit a $520,808.24 check from Mitchell Sr. made payable to Agriliance, the Mitchells, and another entity. Agriliance alleges the Mitchells placed conditions upon relinquishing this check, including, among other things, the Mitchells receiving a loan for the 2002 crop input expenses. Agriliance refused to make the additional loan, the Mitchells denied Agriliance's request to make payments toward the prior loans, and Agriliance filed a replevin action against the Mitchells in Iowa state court.

The record contains circumstantial evidence suggesting that the Mitchells delivered and eventually sold the grain from their 2001 crops to ABC Grain in February 2002.[1] On February 21, 2002, ABC Grain issued two checks made payable to the Mitchells and Lost Prairie, L.C. (a Mitchell created corporation), totaling $468,546.86 and drawn on Citizens Bank. After receiving these checks, Citizens Bank transformed these two ABC checks into one Cashier's Check drawn on Citizens Bank and made payable to Farmpro in the exact same amount of $468,546.86. The Mitchells then went to Farmpro and delivered this Cashier's Check,[2] along with

---

1. In addressing the affirmative defense that Farmpro and Central Bank failed to mitigate, Agriliance asserts, but provides no citation to evidence in the record, that upon becoming suspicious, it obtained a List of Potential Buyers from the Mitchells and served notice on them and others Agriliance believed might

buy the crops. Agriliance argues neither ABC Grain or its owners were included on this List of Potential Buyers.

2. For purposes of this order, it is the $468,546.86 Citizens Bank Cashier's Check ["Cashier's Check"] that Agriliance claims

another Cashier's Check by Mitchell Sr., drawn on Wells Fargo, for $56,012.97. These payments totaled the amount of the Mitchells' indebtedness to Farmpro.

Shortly thereafter, Drey of Farmpro contacted Tim Brown ["Brown"] of Central Bank telling him he wanted to make sure the check was good. Brown called Citizens Bank to determine if the check was good, although at his deposition Brown indicated he believed Drey had no reason to believe the check would not be good. Brown spoke with the secretary of the Citizen Bank President, who allegedly told Brown "the check is good because Marvin has been meeting with [the president of Citizens Bank] for the last two days." Brown asked no more questions and spoke to no one else. Brown did not call Wells Fargo regarding the validity of the Mitchell Sr. check because he believed Mitchell Sr. had substantial financial resources. As the Mitchells had requested at the time the checks were negotiated, Farmpro released the Mitchell Sr. guarantee and the mortgages.

Once it came to believe Farmpro held proceeds from the Mitchells' 2001 crop, Agriliance made written demand on Farmpro for the Cashier's Check, which Farmpro refused. On May 24, 2002, Agriliance commenced the present lawsuit against Farmpro, asserting conversion and breach of contract claims, subsequently amending its complaint to add the conversion claim against new Defendant Central Bank.[3]

At its core, this suit relates a belief by Agriliance that the Cashier's Check was funded with proceeds from the Mitchells' 2001 crop, and Agriliance, therefore, believes Farmpro is liable for conversion after having accepted and refusing to relinquish the Cashier's Check. The claim of conversion against Central Bank is based on Farmpro having transferred an unknown amount of the Cashier's Check to Central Bank for its participation in the Mitchell 2001 crop input expense loan.[4] The breach of contract claim against Farmpro arises out of the Subordination Agreement and Farmpro's acceptance of the Cashier's Check in claimed contravention of Agriliance's interests. On March 12, 2003, Agriliance requested summary judgment on all counts.

Resisting the Agriliance breach of contract claim, Farmpro argues nothing in the Subordination Agreement required Farmpro to remit *all* payments received from the Mitchells or Mitchell Sr. unless and until Agriliance was paid in full. Believing Agriliance has failed to establish a breach of any term in the agreement between them, Farmpro argues Agriliance has failed to carry its burden of proof on the breach of contract claim, and the Agriliance motion for summary judgment as to

represents proceeds of the Mitchells' 2001 crop.

3. Central Bank is involved because Farmpro would participate the loans it made, including this one, to Central Bank. Tim Brown held more than a 50 percent ownership interest in Central Bank and was also involved in Farmpro. After helping to establish Farmpro, he was a director and investor in the company. By January 2000, Farmpro had fallen on hard times and by January 1, 2002, of the original investors, only Tim Brown and one other remained at Farmpro. It is because of Brown's relationship with both Farmpro and Central

Bank that Agriliance argues Central Bank should be imputed with the actions, notice, and knowledge of Farmpro.

4. Farmpro and Central Bank point out that because Agriliance has not alleged nor argued that the Court should disregard the separateness of the identity between Farmpro and Central Bank, Agriliance's ability to recover against Central Bank rests upon a showing that Central Bank received proceeds of the Cashier's Check which was funded by the Mitchells' 2001 crop, and that Central Bank is not a holder in due course.

this count should be denied. In resisting the Agriliance conversion claim, Farmpro and Central Bank[5] argue Agriliance has not demonstrated the Cashier's Check was purchased with the proceeds of the sale of the Mitchells' 2001 crop, and, thus, the conversion claim fails as a matter of law. Farmpro asserts that it subordinated only its interest to *Marvin* Mitchell's 2001 crop proceeds and points out that because the ABC checks were made payable to both Mitchells and Lost Prairie, L.C., fairness requires that this Court not infer that the ABC checks were written solely for purchasing the grain of only one of the three payees on the check.

Additionally, Defendants have filed their own cross-motion for summary judgment on all counts. In support, Farmpro initially points out that despite Agriliance's knowledge that Farmpro was a creditor of the Mitchells, Agriliance never notified Farmpro of Argiliance's early February 2002 suspicions that the Mitchells had sold the 2001 crop to Mitchell Sr. and were not turning over a check. This is important because Farmpro alleges that before tendering the two Cashier's Checks, Marvin Mitchell had called on two occasions to inquire about paying off his indebtedness with Farmpro before February 20, 2002, and had also asked what would be needed to have the mortgages released instantly. Shortly thereafter, the Mitchells presented Farmpro with the Cashier's Check, and Farmpro argues that in the absence of any knowledge of the Agriliance concerns, Farmpro had no reason to question the source of funding for the check at the time it was accepted.

Farmpro and Central Bank contend they believed the checks were funded as a result of the Mitchells having refinanced with Citizens Bank, financial assistance with Mitchell Sr., or a combination of both. They also claim they believed the checks were funded by possible real estate transactions. Farmpro and Central Bank point out that nothing on the face of the Cashier's Check indicated the check was subject to a claim by Agriliance, and nothing indicated the check was the result of the sale of grain. Additionally, they argue the standard industry practice is for senior lenders to take the necessary steps to ensure a grain elevator or a grain dealer issues a two-party check for the sale of grain so that when they received the Cashier's Check made out solely to Farmpro, neither Farmpro nor Central Bank had any indication that proceeds from the Mitchells' 2001 crop funded the check. Farmpro and Central Bank, therefore, argue they qualify as a holder in due course of the Cashier's Check and take free of any Agriliance interest.

Assuming the Cashier's Check is funded by proceeds from selling the Mitchells' 2001 crop, and because being a holder in due course is an affirmative defense to a claim of conversion, Defendants argue they are entitled to judgment as a matter of law on the conversion claim.

As between two innocent parties, Farmpro and Central Bank argue the law favors leaving the loss that a third-party's misdeeds cause with the party in the best position to have prevented the loss. *See Deater v. City Nat'l Bank of Council Bluffs*, 223 Iowa 86, 272 N.W. 423, 425 (Iowa 1937). They argue that, assuming the Agriliance allegations are true, the culpable party in this case is Marvin Mitchell, while Farmpro and Central Bank are innocent parties. As between Agriliance and them, Farmpro and Central Bank argue that only Agriliance had actual knowledge in early February 2002 that Marvin Mitch-

---

5. Defendants also argue that Plaintiff makes no argument to support recovery against Central Bank and so, even if the summary judgment record supported judgment against Farmpro, there is no basis, on that record, for judgment against Central Bank.

ell sold the grain or intended to do so prior to the time Farmpro and Central Bank acted in reliance on the Cashier's Check and released the mortgages and guarantees in satisfaction of the Mitchells' debt. According to Farmpro and Central Bank, Agriliance was best able to prevent the loss by simply notifying Farmpro of Agriliance's suspicions and, having failed to do that, under the general policy of *Deater,* Agriliance should suffer the loss.

In reply, Agriliance argues the entire purpose of the Subordination Agreement was that Agriliance would have priority over Farmpro to the Mitchells' crop and proceeds, not just Marvin's share. Agriliance points out that while the entire agreement may not have spelled out every conceivable contingency, Farmpro's obligation to turn over money from the Mitchells' crop is so obvious that it need not be expressly mentioned in the agreement. Agriliance disagrees with Farmpro's assertion that, as between two innocent parties, the law favors placing the loss at the one in the best position to have prevented the loss, and argues the law places the loss on one who is not a holder in due course.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the record, when viewed in the light most favorable to the nonmoving party (including giving the nonmovant the benefit of all reasonable inferences), indicates there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *see also Krein v. DBA Corp.,* 327 F.3d 723, 726 (8th Cir.2003). Once the moving party carries its burden of demonstrating the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and, by affidavits or deposition, answers to interrogatories, and admission on file, show the existence of specific facts indicating a genuine issue exists for trial.

Fed.R.Civ.P. 56(c), (e); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Krein,* 327 F.3d at 726.

Rather than weigh the evidence or make credibility determinations, the Court is only to determine if disputed issues exist and, if so, whether those issues are both genuine and material. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If the evidence could sufficiently persuade a reasonable jury to return a verdict for the nonmoving party, the issue is "genuine"; and, if the dispute over it could affect the outcome of the case under the applicable law, the issue is "material." *Id.* at 248, 106 S.Ct. 2505. Here, the parties agree on the essential facts but dispute the conclusions to be drawn from those facts.

## III. DISCUSSION

In general, this case concerns secured transactions, and, thus, Article 9 of the Uniform Commercial Code is applicable, Iowa's version being located at Iowa Code § 554.9301, et seq. The Cashier's Check at issue in this case is a negotiable instrument "subject to the priority rules of Article 3 of the UCC." *Agriliance, L.L.C. v. Runnells Grain Elevator, Inc., et al.,* 272 F.Supp.2d 800, 810–11 (S.D.Iowa 2003) (citing *Valley Nat'l Bank v. Porter,* 705 F.2d 1027, 1029–30 (8th Cir.1983)). Iowa Code § 554.9331(1) indicates that the priority rules of Article 3 govern over the priority rules of Article 9. *See* Iowa Code § 554.9331(1) (stating "[t]his Article does not limit the rights of a holder in due course of a negotiable instrument.... These holders [in due course] ... take priority over an earlier security interest, even if perfected, to the extent provided in Articles 3, 7, and 8."); *see also* Iowa Code § 554.3306 (discussing that "[a] person taking an instrument, other than a person having rights of a holder in due course, is subject to a claim of a property or posses-

sory interest in the instrument or its proceeds.... A person having rights of a holder in due course takes free of the claim to the instrument.").

■ While Farmpro and Central Bank argue Agriliance has not carried its burden of proof in showing the $468,564.86 Cashier's Check was funded with proceeds of the Mitchells' 2001 crop, the Court disagrees and finds the record adequately demonstrates the $468,564.86 Cashier's Check represents proceeds from the sale of the Mitchells' 2001 crop.[6] Additionally, the Court agrees with Agriliance and finds that the record supports imputing the conduct, notice, and knowledge of Farmpro to Central Bank. Therefore, the Court refers to Defendants Farmpro Services Inc. and Central Bank collectively as Farmpro. As the Court is of the view that one may possess a negotiable instrument, not be liable for the intentional tort of conversion for lack of the requisite knowledge that one's control is inconsistent with another's right, yet still not be a holder in due course for failure to exercise good faith under the attendant circumstances, the Court will separately analyze the conversion claim and then address the affirmative defenses raised by Farmpro, including its status as holders in due course.

## A. Agriliance Motion for Summary Judgment.

### 1. Conversion claim against Farmpro and Central Bank.

■ In Iowa, the exercise of "wrongful control or dominion over another's

property contrary to that person's possessory right to the property" is conversion. *Condon Auto Sales & Serv., Inc. v. Crick,* 604 N.W.2d 587, 593 (Iowa 1999) (citing *Ezzone v. Riccardi,* 525 N.W.2d 388, 396 (Iowa 1994)). To prevail on its conversion claim, Agriliance must have had a possessory right to the 2001 Mitchell crop.

■ Although Farmpro makes much of the Subordination Agreement referring to *Marvin* Mitchell, nothing in the record suggests either of the Mitchells have specific rights to crops to the exclusion of the other. Despite their current argument to the contrary, paragraph six (6) of the Debt Settlement Agreement demonstrates that prior to this litigation, Farmpro considered the Mitchells' farming endeavors as a joint operation. The Court finds that the evidence in the record, which includes correspondence and negotiable instruments, demonstrates that the farming activities in question were a joint venture of the Mitchells. Thus, Marvin Mitchell's actions, as relating to the farming operations, bind Marlene Mitchell equally. *See, e.g.,* Iowa Code § 486A.301(1) (stating "[e]ach partner is an agent of the partnership for the purposes of its business. An act of a partner ... for apparently carrying on in the ordinary course of the partnership business ... binds the partnership...."). The essential purpose of the Subordination Agreement was that Farmpro would subordinate its interest in the 2001 crop of the Mitchells in favor of Agriliance, and "[a] contract includes not only what is expressly stated but also what is necessarily to be

---

6. *See, e.g.,* Agriliance Ex. 61, App. p. 269 (February 28, 2002, letter from Mitchells to Agriliance and others wherein the Mitchells explain the grain Agriliance knew of was sold to ABC Grain on February 21, 2002); Agriliance Ex. 60, App. pp. 267–68 (two of ABC Grain's February 21, 2002, purchase orders for the Mitchells' crops in the combined amount of $468,546.86); Agriliance Ex. 52,

App. pp. 235–37 (two ABC Grain checks dated February 21, 2002, made payable to Marvin and Marlene Mitchell and Lost Prairie, L.C., for the combined amount of $468,546.86); Agriliance Ex. 50, App. p. 197 (February 21, 2002, Cashier's Check drawn against Citizens Bank, made payable to Farmpro for the amount of $468,546.86).

implied from the language used; and terms which may clearly be implied from a consideration of the entire contract are as much a part thereof as though plainly written on its face." *See Fashion Fabrics of Iowa v. Retail Investors Corp.*, 266 N.W.2d 22, 27 (Iowa 1978) (quoting *Freeport Sulphur Co. v. American Sulphur Royalty Co. of Tex.*, 117 Tex. 439, 6 S.W.2d 1039, 1042 (1928)).

Having filed the appropriate financial statement with the Iowa Secretary of State on March 12, 2001, Agriliance holds a perfected security interest in the Mitchells' 2001 crops. *See Agriliance*, 272 F.Supp.2d at 802. "Agriliance's security interest gives it a possessory right to the Mitchells' 2001 crops, as against junior competing claims." *Id.* at 804.

 The issue becomes whether Farmpro and Central Bank have "exercised wrongful control over the crops that were the subject of Agriliance's security interest." *Id.* at 805–06. To prevail on a claim for conversion, the "wrongful control must amount to a serious interference with the other person's right to control the property." *Id.* (quoting *Condon Auto Sales & Serv.*, 604 N.W.2d at 593). In Iowa, to determine whether conduct amounts to a "serious interference" with the possessory rights of another, the following factors are used: (1) the extent and duration of the exercise of dominion and control; (2) the actor's intent to assert a right inconsistent with the other's right; (3) the actor's good faith; (4) the extent and duration of resulting interference; (5) the harm to the chattel; and (6) the inconvenience/expense of the other. *Id.* (citing *Kendall/Hunt Publ'g Co. v. Rowe*, 424 N.W.2d 235, 247 (Iowa 1988), which in turn cites Restatement (Second) of Torts § 222A(2)). There is no question that the Defendants have exercised total control over the proceeds of the Mitchells' 2001 crop since receiving the Cashier's Check in February of 2002.

In their pleadings and at oral argument, the parties treat the analysis of the good faith element of intentional conversion as equivalent with the good faith element of holder in due course status. For instance, Agriliance argues that the only *Rowe* factor requiring discussion was the "good faith" of Defendants, and then proceeded to analyze the good faith element simultaneously with the good faith requirement needing to be met in order to be according holder in due course status.

Agriliance points to the following factors as demonstrating bad faith, which justifies a finding of conversion while denying Defendants status as holders in due course: (1) 98 percent of all Farmpro business was related to financing crop inputs, suggesting Farmpro knew how this business was or should be run; (2) 25 percent of Farmpro's business was comprised of the Mitchells' loans, and Farmpro had some difficulty with the Mitchells repaying these loans; (3) Farmpro had never before been presented with a Cashier's Check when the Mitchells delivered the two on February 28, 2002; and (4) in light of the fact that Cashier's Checks, by definition, are "good funds", that Farmpro called to verify whether the funds were "good" indicates Farmpro was suspicious of the Mitchells.

Additionally, Agriliance points out the dispute surrounding the Mitchells' repaying Farmpro resulted in all parties obtaining attorneys, leading to a settlement agreement being reached. This type of settlement agreement was the first Farmpro had entered into with a borrower, and Agriliance argues that between 1999 and 2002, Farmpro had only two crop input loans which needed to be restructured and secured by real estate in similar fashion.

Alluding to the fact that at the time the Cashier's Checks were accepted, Farmpro

had restructured these loans so that paying them off was not due for years, Agriliance views the Farmpro and Central Bank actions as indicative of only being concerned about being paid and adhering to the adage "take the money now and ask questions later."[7] Challenging Farmpro's assertion that when it accepted the checks it believed a possible source of funding was Mitchell Sr., Agriliance asks why Mitchell Sr. would not have used one cashier's check rather than two from two separate banks.

Thus, Agriliance asserts Farmpro's acceptance of the Cashier's Check, passing some along to Central Bank, and then both entities refusing to return the proceeds despite Agriliance demands,[8] is an act in contravention of Agriliance's interest (i.e. under *Rowe*, indicates an *intent* to assert a right inconsistent with another's right). At oral argument, Agriliance asserted that the Court did not need to decide whether "good faith" is subject to a negligence standard because Farmpro and Central Bank were not incompetent, but instead, under the circumstances of this case, their acts rose to the level of willful acts sufficient to find them liable for the intentional tort of conversion.

As more thoroughly discussed in the holder in due course analysis which follows, Farmpro relies on their assertion that nothing indicated Agriliance made a claim to the actual Cashier's Check, argues it acted in good faith, and argues its status

as a holder in due course controls, under Iowa Code § 554.9331(1) and § 554.3306.

In this case, although Agriliance asks this Court to infer bad faith from Farmpro's actions, the Court points out, as did Agriliance, that this Cashier's Check was one of the first Farmpro had ever received. When the Cashier's Check was accepted, nowhere did it indicate the Mitchells' 2001 crops funded the check. *See Allison–Kesley Ag. Ctr. v. Hildebrand*, 485 N.W.2d 841, 844 (Iowa 1992) (indicating that the proper time to determine whether a recipient has notice of a claim is at the time the instrument was negotiated). The record does not support a finding that the actions rise to a level beyond incompetence or negligence to the degree of intentional willfulness sufficient to establish conversion. The "commercial standards of fair dealing" part of the definition of good faith now included in Article 3 is not concerned with standards of care. Iowa Code § 554.3103(d) cmt. (4). Under the circumstances of this case, the Court does not find that Farmpro and Central Bank's actions rise to a degree of willful blindness indicating such bad faith and intentional conduct as to find them liable, as a matter of law, for the intentional claim of conversion. Absent evidence that Farmpro and Central Bank acted with knowledge that their exercise of control over the funds was inconsistent with the rights of Agriliance, the Court does not find conversion; thus, the Agriliance claim

---

**7.** The Court notes that Brown testified that at the time the Cashier's Checks were accepted, Farmpro was no longer loaning money, but instead focusing on collecting the loans it had provided and had run into difficult times. By January 2002, of the original investors in Farmpro, only Brown and one other remained involved.

**8.** Agriliance points out it did not make a demand on Central Bank for the return of crop

proceeds before initiating this action because only became aware of Central Bank possessing proceeds from the Cashier's Check after certain depositions took place on November 25, 2002. Having imputed the knowledge of Farmpro to Central Bank, via Tim Brown, Central Bank cannot claim it was unaware of the Agriliance claims prior to this suit being filed.

for conversion does not withstand summary judgment analysis.

### 2. Breach of Contract Claim against Farmpro.

In Iowa, a party seeking to recover for breach of contract must prove (1) the existence of a contract; (2) the terms of the contract; (3) that the party suing for breach of contract has performed all of the terms of the contract; (4) that the defendant breached the contract; and (5) that the plaintiff has suffered damages as a result of the breach. *Molo Oil v. River City Ford Truck Sales*, 578 N.W.2d 222, 224 (Iowa 1998). A contract may be breached through the negligence of one of the contracting parties. *See generally Haupt v. Miller*, 514 N.W.2d 905, 911 (Iowa 1994) (citing *Redgrave v. Boston Symphony Orchestra Inc.*, 557 F.Supp. 230, 237–38 (D.Mass.1983) (which holds that refusal to perform a contract is not a tort)); *see also Goben v. Des Moines Asphalt Paving Co.*, 218 Iowa 829, 252 N.W. 262, 267 (Iowa 1934) (highlighting *Russell & Co. v. Polk Co. Abstract Co.*, 87 Iowa 233, 54 N.W. 212, 213 (1898), as saying "the defendant, independent of the contract, owed no duty to the plaintiff. The neglected duty was one alone enjoined by contract. The failure to perform ... is solely a breach of contract.... The fact that the act is alleged as negligently done does not change the situation.").

Although Farmpro argues that pursuant to the UCC, the Subordination Agreement is not a deciding factor here since this case is governed by Article 3, and the Subordination Agreement only establishes priority under Article 9, this is unpersuasive because Iowa's UCC acknowledges that private agreements are enforceable. *See* Iowa Code § 554.1102(3) (stating "[t]he effect of provisions of this chapter may be varied by agreement, except as otherwise provided...."). In this case, the record contains the Subordination Agreement signed by Farmpro and Agriliance, thereby proving the existence and terms of a contract between them. There is no indication that, under this contract, Agriliance has any duty which remains unperformed. The Court has found that Farmpro subordinated its interest in the Mitchells' 2001 crops to Agriliance. Having already concluded that the Cashier's Check was funded by proceeds from the Mitchells' 2001 crops, the Court finds Farmpro has breached the Subordination Agreement, albeit negligently, and further finds Agriliance has been damaged in the amount of $468,564.86. The Court must grant Agriliance's motion for summary judgment as to its breach of contract claim.

### B. Cross–Motion for Summary Judgment.

The essence of the cross-motion for summary judgment filed by Farmpro and Central Bank is that the priority rules of Article 3 govern the rights to the Cashier's Check and that Farmpro and Central Bank stand in the position of a holder in due course. The Court has previously found the priority rules have been modified by contract consistent with the provisions of Iowa Code § 554.1102(3). The Court now turns to an analysis of the holder in due course status.

The Court recognizes that the status of holder in due course is an affirmative defense to conversion. *See Waukon Auto Supply v. Farmers & Merch. Sav. Bank*, 440 N.W.2d 844, 846 (Iowa 1989). Although the Court has found Farmpro and Central Bank have not intentionally converted the proceeds of the Mitchells' 2001 crops, Agriliance does have a superior interest in the proceeds of the Mitchells' 2001 crops by way of the Subordination Agreement, and, therefore, unless

Farmpro and Central Bank are afforded holder in due course status, Agriliance is entitled to the Cashier's Check. *See* Iowa Code § 554.3306. Thus, the status of Farmpro and Central Bank as a holder in due course must still be analyzed because Farmpro possesses a negotiable instrument, and the priority of a secured creditor who claims a negotiable instrument as proceeds, compared to another party in possession of the instrument, hinges on the determination of the holder's status as a holder in due course. *See First Nat'l Bank v. Creston Livestock*, 447 N.W.2d 132, 133 (Iowa 1989).

Defendants argue they are holders in due course and, therefore, take the Cashier's Check free of Agriliance's prior security interest. "[A] holder in due course takes a negotiable instrument free of any claim to the instrument, including claims of prior secured parties." *Agriliance*, 272 F.Supp.2d at 810–11 (citing Iowa Code §§ 554.3302, 554.3306, 554.9331). To qualify as holders in due course, the instrument must have been taken "a) for value, b) in good faith, and c) without notice that it was overdue or had been dishonored, or of any contrary claim to rights in the instrument, and without notice that any party has a defense or claim in recoupment." *See id.* (citing Iowa Code § 554.3302). The Cashier's Check was accepted for value, with Farmpro receiving the check as repayment of loans and Central Bank taking some of the funds for its participation in this loan. Their status as holders in due course, therefore, hinges on whether they meet the good faith and notice elements of holder in due course status.

### 1. Good Faith.

Farmpro argues that good faith "means honesty in fact in the conduct or transaction concerned." Iowa Code § 554.1201(19). Farmpro argues this definition is purely a subjective test focusing exclusively on the holder's actual knowl-edge. *First Nat'l Bank v. Creston Livestock*, 447 N.W.2d at 134. Continuing, Farmpro asserts the focus is on whether the holder had actual notice of the secured party's claim to the check, not just general knowledge that the secured party had a general lien. Farmpro asserts that negligence or even knowledge of suspicious circumstances is not sufficient to show bad faith. *Valley Nat'l Bank*, 705 F.2d at 1029.

At the time it accepted the checks, Farmpro argues it was unaware that the Mitchells had sold their 2001 crops, and while it had knowledge that Agriliance had a general claim to Marvin Mitchell's 2001 crops, there was no indication that the Cashier's Check was related to Marvin Mitchell's 2001 crop. Since it did not have actual knowledge of Agriliance's interest in the $468,564.86 Cashier's Check, Farmpro argues, as a matter of law, it acted in good faith when it accepted the check. *Allstate Fin. Corp. v. Financorp, Inc.*, 934 F.2d 55 (4th Cir.1991) (wherein the Fourth Circuit Court of Appeals affirms the grant of summary judgment in favor of a holder when a secured party making claim to the instrument offered no evidence to support a finding of actual knowledge); *see also Fin. Mgmt. Serv. v. Familian Corp.*, 183 Ariz. 497, 905 P.2d 506, 510–11 (1995) (concluding record lacked evidentiary support for trial court's finding that the defendant was not a holder in due course, in part because there was no evidence which would have indicated that the defendant believed there was anything wrong with the instrument at issue).

The problem for Farmpro and Central Bank is that while they cite to Iowa Code § 554.1201(19) for a purely subjective standard of "good faith", section 1201 begins with the qualification that it is "subject to additional definitions in the subsequent Articles in this chapter...." Iowa Code

§ 554.1201. Article 3 was amended in 1995 to add an objective component to the definition of good faith, changing a definition which was purely subjective. *See Agriliance,* 272 F.Supp.2d at 811, n. 9. Under Article 3, good faith is now defined as "honesty in fact and the observance of reasonable commercial standards of fair dealing." *Id.* at 810 (citing Iowa Code § 554.3103(1)(d)).

Observing reasonable commercial standards of fair dealing, Agriliance argues, means a person has a duty to inquire where facts exist which would put a reasonable person on notice of the possibility of a prior claim to the instrument. A significant point not lost on the Court is that UCC comment 5 to section 554.9331 specifically indicates that after the amended definition of good faith, "[d]ecisions such as *Financial Management Services, Inc. v. Familian,* [which Farmpro cites as support for finding it acted in good faith and is a holder in due course] could be determined differently under this application of the good-faith requirement". Thus, observing reasonable commercial standards of fair dealing is judged from a reasonable bank/lending institution perspective sitting in the shoes of Farmpro and Central Bank, and while "'good faith' does not impose a general duty of inquiry, ... there may be circumstances in which reasonable commercial standards of fair dealing" may call for it. *See generally Agriliance,* 272 F.Supp.2d at 810 (referring to Iowa Code § 554.9331 UCC cmt. (5)).

Whether reasonable commercial standards of fair dealing were observed when the Cashier's Check was accepted without making inquiry as to the source of the funds is ultimately a question of whether a reasonable lender (Farmpro) and reasonable bank (Central Bank) would have had reason to know of the potential competing claim to the Cashier's Check at the time the check was accepted, such that they should have inquired about how the check was funded before accepting it. *See generally, Agriliance,* 272 F.Supp.2d at 812–13. In this sense then, the analysis of good faith merges with the determination of whether Defendants had notice of the competing claim to the $468,564.86 check. *Agriliance,* 272 F.Supp.2d at 812–13; *see also Joe Morgan, Inc. v. Amsouth Bank N.A.,* 985 F.2d 1554, 1562 (11th Cir.1993) (indicating that where an objective component to the Article 3 definition of "good faith" exists, the good faith and notice elements of the holder in due course analysis frequently merges).

### 2. Notice.

Although Farmpro had actual knowledge of the superior Agriliance interest in the Mitchells' 2001 crops, an interest which Agriliance perfected, this fact alone does not put Farmpro on notice of the Agriliance claim to the Cashier's Check and does not limit one's ability to be afforded status as a holder in due course. *Agriliance,* 272 F.Supp.2d at 810–11 (citing Iowa Code § 554.9331(3), which says "[f]iling under this Article does not constitute notice of a claim or defense to [holders in due course of negotiable instruments]."). In this case, unless Farmpro had constructive notice of the Agriliance claim to the Cashier's Check, the general rule that "good faith" imposes no general duty of inquiry, *see* Iowa Code § 554.9331 cmt. (5), protects Farmpro, and Farmpro and Central Bank will be afforded holder in due course status.

Farmpro argues that while good faith under Iowa law is subjective, the test for notice has an objective component. One has notice of a fact where a person "has actual knowledge of it, ... has received a notice or notification of it, or from all the facts and circumstances known to the per-

son at the time in question, the person has reason to know that it exists." *Agriliance,* 272 F.Supp.2d at 812–13 (quoting Iowa Code § 554.1201(25)). This is "essentially an objective test of what a reasonable person in the holder's position would know." *Valley Nat'l Bank,* 705 F.2d at 1029.

Agriliance attempts to distinguish many of the Farmpro and Central Bank authorities by arguing they predate the 1995 revision to Article 3's "good faith" definition. While cases such as *Valley Nat'l Bank* are no longer persuasive regarding the "good faith" analysis, the case discussion on notice was "unaffected by the 1995 amendments to the good faith test." *Agriliance,* 272 F.Supp.2d at 812–13. "Where ... the objective good faith and notice tests are the same, the analysis of [these earlier cases and their discussion on notice] also has bearing on the objective prong of the good faith analysis." *Agriliance,* 272 F.Supp.2d at 812–13. "Under Iowa law, a court must determine whether [Farmpro and Central Bank] actual knowledge is, under the circumstances, sufficient to allow the holder to 'reasonably infer the probable existence of the claim.'" *Id.* at 812–13 (citing *Valley Nat'l Bank,* 705 F.2d at 1029, which in turn quotes *Eldon's Super Fresh Stores v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 296 Minn. 130, 207 N.W.2d 282, 287 (1973)).

Agriliance claims that since its motion relates to the objective component of the good faith test rather than the subjective one, Farmpro's argument that it did not know the proceeds of the Cashier's Check were from the Mitchells' 2001 crop does not address the issue. Agriliance argues that observing reasonable commercial standards of fair dealing means there is a duty to make inquiry when facts would put a reasonable person on notice of the possibility of a prior claim to the instrument. Agriliance further argues that the totality of circumstances (including the previous discussion of the good faith element of conversion) indicates Farmpro did not observe reasonable commercial standards of fair dealing when they accepted the checks because they had notice of facts which ought to have aroused suspicion in a reasonable bank/lending institution, thereby imposing an obligation to investigate before accepting the Cashier's Check.

Farmpro avers that under Article 3, the constructive notice standard is higher than mere negligence, and that a lack of diligence does not impute a party with inquiry notice. At oral argument, Defendants reminded the Court that it had mortgages on real estate and was well secured in the debt the Mitchells owed, implying it would not have accepted the check and immediately released these mortgages had it believed there was a potential claim to the Cashier's Check. Farmpro also urges the Court to recognize that Farmpro could not have called Citizens Bank to inquire about the source of funding for the Cashier's Check, as confidentiality would have prevented Citizens Bank from reporting it had accepted two checks from ABC Grain to fund the Cashier's Check. Moreover, Farmpro argues it risked being liable for not releasing mortgages upon receiving the checks.

Furthermore, they point out that where a holder of a negotiable instrument is suspicious, the law only requires the holder to make inquiry sufficient to satisfy these suspicions. *Indus, Credit Co. v. Hargadon Equip. Co.,* 254 Iowa 757, 119 N.W.2d 238, 244 (Iowa 1963). Here, Farmpro asserts it had, at most, a general suspicion about the check, but, by calling Citizen's Bank and speaking with the secretary to the president of Citizens Bank, who told them the Mitchells had met with the Citizen Bank president for the last two days and the check was "good", it assuaged its concerns. Therefore, when it received the Cashier's

Check which was plain on its face and drawn on the bank with whom Farmpro assumed the Mitchells had refinanced, coupled with a demand that Farmpro release the mortgages, Farmpro argues it was reasonable to believe a refinancing or selling of real estate had occurred.

As indicated, the "fair dealing" in Article 3 is not concerned with the care with which an act is performed. *See* Iowa Code § 554.3103, cmt. (4). It is, instead, "concerned with the fairness of conduct rather than the care with which an act is performed. Failure to exercise ordinary care in conducting a transaction is an entirely different concept than failure to deal fairly in conducting the transaction." *See Agriliance,* 272 F.Supp.2d at 812 (citing Iowa Code § 554.3103, cmt. (4) and *State Bank of the Lakes v. Kansas Bankers Sur. Co.,* 328 F.3d 906, 909 (7th Cir.2003) (discussing that the fair dealing prong of the Article 3 good faith test focuses on "avoidance of advantage-taking, which … differs from due care")). Under this authority, while Farmpro's actions do not rise to the level of the intentional tort of conversion, Farmpro's conduct does impact the holder in due course analysis.

The Mitchells' loans constituted nearly a quarter of Farmpro's business. Dealing almost exclusively in funding crop inputs, Farmpro knew or should have known that it often received payment from farmers on its outstanding loans in January and February, the time of year farmers receive money from the sale from the previous year's crop. The Court notes that in this case, Farmpro and Central Bank received the Cashier's Check from the Mitchells in late February 2002. Farmpro was aware that it had subordinated its interest in the 2001 Mitchell crop, was aware of having restructured these loans, and was aware that a few years prior, the Mitchells were unable to make loan payments. In addition to actually knowing the terms of the Subordination Agreement, Farmpro also knew that Marvin Mitchell had previously withheld grain proceeds in 1999 though never knew him to have ever converted these funds. In Iowa, knowledge of unscrupulous behavior has been enough to impose a duty to inquire. *See, e.g., Lundean v. Hamilton,* 184 Iowa 907, 169 N.W. 208, 210, 212 (Iowa 1918) (determining a bank had a duty to inquire into the authenticity of a mortgage because, along with other reasons, the bank knew the defendant to be a "scoundrel and a rascal"). The Court finds Farmpro's lack of suspicion that the funding of the Cashier's Check was from the Mitchells' 2001 crops was not in observance of reasonable commercial standards of fair dealing under the unique circumstances of this case. Farmpro's assumption that both Cashier's Checks were funded by Mitchell Sr. was not a reasonable assumption to make, especially where, as here, Farmpro received two separate checks drawn on two separate banks, with one clearly being funded by Mitchell Sr.

█ As explained, "[t]he proper time for determining whether the recipient of an instrument has notice of a claim or defense is the time of negotiation of the instrument to the holder." *Allison–Kesley Ag. Ctr. v. Hildebrand,* 485 N.W.2d 841, 844 (Iowa 1992). The Court finds unpersuasive Farmpro's argument that their general suspicions of the Mitchells' ability to pay back their loans in 1999 did not impact their thinking when the check was negotiated to Farmpro in February, 2002. The Court is also unpersuaded by Farmpro's plea that, had it not released these mortgages at the time the check was negotiated, it was at risk of being fined. Nothing required it to release the mortgages at the time of negotiation, and the Iowa Code provided Farmpro up to thirty (30) days in which to release its mortgages in satisfaction of outstanding debts. *See* Iowa Code § 655.3.

The Court is unpersuaded by the citation to *Indus. Credit Co.,* 119 N.W.2d at 244, a 1963 case which Farmpro provides for its position that there is only a duty to investigate to satisfy one's suspicions. After the 1995 amendment to the definition of good faith, the question has become whether this type of investigation demonstrates good faith and the observance of reasonable commercial standards of fair dealing where the facts suggest (i.e. one is on constructive notice) that the negotiable instrument being presented could potentially be subject to claims and defenses. *See Joe Morgan,* 985 F.2d at 1560–62; *see also Valley Nat'l Bank,* 705 F.2d at 1029 (quoting *Eldon's Super Fresh Stores,* 207 N.W.2d at 287).

In the context of a bank accepting indorsed negotiable instruments, the Iowa Court of Appeals has indicated that, along with other things, a bank president's knowing that one who converted funds had a "significant history of returned checks and overdrafts" should have aroused the bank's suspicion, causing it to investigate. *See Phariss v. Eddy,* 478 N.W.2d 848, 851 (Iowa Ct.App.1991). Here, despite knowing of the Mitchells' previous financial difficulties and the circumstances surrounding the Subordination Agreement, rather than specifically asking the source of the funds, which they could have done, Farmpro and Central Bank assumed a refinancing occurred, assumed a real estate transaction occurred, and assumed financial assistance from Mitchell Sr. was involved. These assumptions were made entirely based on a single conversation Brown had with the secretary to the president of Citizens Bank. In the context of accepting indorsed instruments, which the Court concedes is factually different than the situation presented, the Iowa Supreme Court has indicated assumptions made by banks who are on constructive notice is not a commercially reasonable activity. *See Waukon Auto,* 440 N.W.2d at 847–49 (discussing the practice of Waukon Auto's using a rubber stamp to indorse checks should have caused the bank suspicion leading it to investigate when Waukon Auto's manager presented checks for cash with hand-written indorsements, and concluding it was not commercially reasonable "simply to assume that [the manager] had authority to cash checks").

"Whether a junior secured party qualifies as a holder in due course is fact-sensitive and should be decided on a case-by-case basis in light of those circumstances." Iowa Code § 554.9331 cmt. (5). Under all of the foregoing facts and evidence presented, the Court finds Farmpro should have known that the Cashier's Check was quite possibly funded by the Mitchells' 2001 crops and could, therefore, potentially be subject to the Agriliance interest. *See Joe Morgan,* 985 F.2d at 1561–62. Additionally, Farmpro had actual knowledge of having subordinated its interest to the Mitchells' 2001 crop. In this case, Farmpro received this Cashier's Check from the Mitchells only because of Agriliance having provided the Mitchells a crop input loan for 2001. There is a certain irony in finding, as the Court does, that under the circumstances of this case, when it accepted the Cashier's Check, Farmpro did not avoid taking advantage of Agriliance. *State Bank of the Lakes,* 328 F.3d at 909 (indicating the commercial standards of fair dealing definition of good faith in Article 3 focuses on "the avoidance of advantage-taking, which ... differs from due care.").

Farmpro (and Central Bank) cannot be seen to have taken the Cashier's Check without notice of the potential Agriliance claim to the check because Farmpro had "actual knowledge of facts from which it could be reasonably infer the probable ex-

istence of [the Agriliance] claim." *Valley Nat'l Bank,* 705 F.2d at 1029 (quoting *Eldon's Super Fresh Stores,* 207 N.W.2d at 287); *see also Joe Morgan,* 985 F.2d at 1560–62. Neither Farmpro nor Central Bank are holders in due course and both took the Cashier's Check subject to all claims and defenses. *See* Iowa Code § 554.3306. The UCC's policy of placing a loss on whomever, as between two innocent parties, is the party most easily or best able to have prevented the loss, *see Nat'l Union Fire Ins. Co. of Pittsburgh v. Riggs Nat'l Bank of Washington, D.C.,* 5 F.3d 554, 557 (D.C.Cir.1993), is inapplicable here since the Court concludes Farmpro and Central Bank are not innocent parties. Having determined that the Cashier's Check was funded by proceeds from the Mitchells' 2001 crops, which Agriliance has a superior interest in as compared to either Farmpro or Central Bank, and determining neither are holders in due course, Agriliance is entitled to $468,564.86, the amount of proceeds from the Mitchells' 2001 crop, even though the Cashier's Check was not intentionally converted. The cross-motion of Farmpro and Central Bank for summary judgment must be denied.

## IV. CONCLUSION

There are no genuine issues of material fact, and judgment may be entered as a matter of law. Based on the foregoing analysis, Plaintiff's Motion for Summary Judgment (Clerk's No. 32) is **granted in part and denied in part,** and Defendants' Motion for Summary Judgment (Clerk's No. 37) is **denied.** The Clerk shall enter judgment in favor of the Plaintiff and against the Defendants in the amount of $468,546.86 plus interest and costs.

**IT IS SO ORDERED.**